

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————

No. 02-24-00154-CV

———————————————

JACOB SPAIN, STEPHEN BAKER, CONNER ASH, AND COLE HAYES,
Appellants

V.

MANPOW, LLC AND UNITED INVESTEXUSA 28, LLC, Appellees

On Appeal from the 48th District Court
Tarrant County, Texas
Trial Court No. 048-349379-24

Before Birdwell, Womack, and Walker, JJ.
Memorandum Opinion by Justice Birdwell

# MEMORANDUM OPINION

Appellants Jacob Spain, Stephen Baker, Conner Ash, and Cole Hayes (collectively, the Individuals) appeal from the trial court's order granting temporary injunctive relief to Appellees United InvestexUSA 28, LLC (UI 28) and ManPow, LLC (collectively, New Western). In two issues, the Individuals argue that the order does not comply with Texas Rule of Civil Procedure 683 and that the trial court abused its discretion by granting a temporary injunction without sufficient evidence of a probable right of recovery. We affirm.

## I. Background

According to Stuart Denyer, New Western's Chief Executive, New Western "is a real estate marketplace . . . [that] primarily deal[s] and work[s] with investment"; it "buy[s] and . . . sell[s] primarily residential investment property -- fix-and-flip, landlord-type stuff." It does not itself "do any of the actual fixing and flipping," nor does it own title to property. The companies that collectively "do business as" New Western are UI 28, which "is . . . the company that manages the broker services," and ManPow, which "provides the service and the people and the HR platform for [the] people that work at New Western."[1] Both companies make up the "New Western brand." They service a client, Powerhouse, which is a holding company that actually

---

[1]Both UI 28 and ManPow are Texas limited liability companies.

takes title to properties.[2] UI 28's independent contractors "are the agents that handle the [property] acquisition and disposition of license and set underneath the brokerage." According to New Western's president, "[T]here's a number of affiliates [involved], and the employees of ManPow provide services for more than one affiliate at any given time."

New Western's "main client base" is made up of people who fix and flip properties or prospective landlords looking to buy rental houses; it "provide[s] a conduit [for them] to access inventory." New Western's business is "unique," and it has invested "millions" in growing and developing its business model.

When hired by ManPow as general manager for its new Indiana office, Spain signed a noncompetition, nonsolicitation, and nondisclosure agreement (the Spain Agreement). Baker, Ash, and Hayes signed similar agreements with UI 28 as independent contractors (the Independent Contractor Agreements).

Spain opened New Western's Indiana office and worked there for about two years.[3] In that role, he "overs[aw] the agents of UI 28." Baker, Ash, and Hayes worked as independent contractors for UI 28's Indiana business: "their job [wa]s to locate suitable properties for the business model."

---

[2]As entities, UI 28 and ManPow do not take title to property, but UI 28 is sometimes a party listed in the buy-and-sell agreements because it provides brokerage services.

[3]According to Denyer, it takes about two years for an office like the one in Indiana to build its client base and become profitable.

In January 2024, Spain resigned from ManPow and formed a new company, Aurum 3 LLC, of which he was the manager. Within days, Baker, Ash, and Hayes terminated their independent-contractor arrangements with UI 28 and went to work for Aurumys, owned by Aurum 3 LLC.

That same month, New Western sued the Individuals claiming that Spain had breached the Spain Agreement—and that Baker, Ash, and Hayes had breached the Independent Contractor Agreements—by "actively compet[ing] with New Western, solicit[ing] New Western's investors, customers, and contractors, and misappropriat[ing] New Western's confidential information and trade secrets to benefit themselves to New Western's detriment."

According to the petition, Spain, "[i]n violation of [the Spain] Agreement[]," "recruited and hired Baker, Ash, and Hayes through his company Aurumys"; they "are all competing directly with New Western." New Western alleged that all four were "specifically targeting and recruiting New Western entity employees and independent contractors to leave New Western and join [the Individuals] at Aurumys." Additionally, New Western alleged that the Individuals were "also targeting New Western's customers, investors, wholesalers, and sellers, whose identities [they had] learned of while working for New Western." According to New Western, "[a]s part of their scheme to poach New Western's investors, [the Individuals]—including through Aurumys—are also marketing properties . . . they actively worked on New Western's behalf during their tenures with New Western."

4

New Western listed its causes of action against each of the Individuals as breach of contract, misappropriation of trade secrets under Chapter 134A of the Texas Civil Practice and Remedies Code, and tortious interference with business relations and against Spain only as tortious interference with contract and breach of fiduciary duty. They also sought a temporary restraining order and temporary injunction. The trial court signed a temporary restraining order on January 12, 2024.

After a subsequent hearing and briefing by the parties, the trial court granted a temporary injunction, finding that New Western had "presented sufficient and competent evidence to support a probable right to relief on the causes of actions asserted against [the Individuals] for breach of contract and misappropriation of trade secrets." The trial court also found that

> an immediate danger exist[ed] that [the Individuals would] continue to breach the Employment Agreement and Independent Contractor Agreements by competing against [New Western] by buying and selling residential real estate through wholesaling and/or assignment and soliciting [New Western's] investors, customers, and accounts unless enjoined; and improperly using or disclosing New Western's Protectable Information [defined broadly as proprietary and confidential information].

Finally, the trial court found that New Western had and would continue to suffer "a probable likelihood of losing [its] investors, customers, and accounts to [the Individuals] and unquantifiable damage to [its] business reputation and goodwill."

The temporary-injunction order lists in detail the evidence upon which the trial court granted relief. Based on its findings, the trial court enjoined the Individuals from

a) directly or indirectly competing against New Western by knowingly buying or selling single-family and 1-4 unit multi-family real estate investment properties by wholesale and/or assignment, or knowingly assisting in the buying or selling of single-family and 1-4 unit multi-family real estate investment properties by wholesale and/or assignment in any of the following counties: Marion, Boone, Hamilton, Madison, Hancock, Shelby, Johnson, Morgan and Hendricks Counties, Indiana;

b) directly or indirectly soliciting, enticing, persuading or inducing, calling upon, or providing services to any of New Western's investors or customers or accounts that [the Individuals] serviced, called upon, learned information about through [their] interactions with New Western, or, in the case of any prospective investors or customers, sought to provide services to, in an effort to sell any services that are similar to or competitive with the services offered by New Western, including but not limited to making contact by any means, including electronic communication, telephone, in-person meetings, or through third parties, in any of the following counties: Marion, Boone, Hamilton, Madison, Hancock, Shelby, Johnson, Morgan and Hendricks Counties, Indiana;

c) recruiting, attempting to recruit, or hiring any employee or contractor of New Western's entities or encouraging, soliciting, enticing, inducing any individual(s) [the Individuals] know to be employees or contractors of New Western's entities to leave their services, including but not limited to the use of job postings, direct contact, or indirect methods such as through recruitment agencies or third-party intermediaries; and

d) using or disclosing Protectable Information of New Western and require [the Individuals] to delete or return New Western's Protectable Information.

The Individuals timely filed this interlocutory appeal. *See* Tex. Civ. Prac. & Rem. Code Ann. § 51.014(a)(4). In two issues, the Individuals contend that (1) the order is void because it is insufficiently specific and therefore does not comply with

6

Rule of Civil Procedure 683 and (2) the trial court abused its discretion because New Western did not bring forward sufficient evidence of a probable right to relief.

## II. Standards Governing Temporary Injunctions and Standard of Review

"A temporary injunction is an extraordinary remedy and does not issue as a matter of right." *Abbott v. Anti-Defamation League Austin, Sw., & Texoma Regions*, 610 S.W.3d 911, 916 (Tex. 2020) (quoting *Walling v. Metcalfe*, 863 S.W.2d 56, 57 (Tex. 1993)). It functions "to preserve the status quo of the litigation's subject matter pending a trial on the merits." *Butnaru v. Ford Motor Co.*, 84 S.W.3d 198, 204 (Tex. 2002) (op. on reh'g) (citing *Walling*, 863 S.W.2d at 57).

"To obtain a temporary injunction, the applicant must plead and prove three specific elements: (1) a cause of action against the defendant; (2) a probable right to the relief sought; and (3) a probable, imminent, and irreparable injury in the interim." *Id.* The applicant bears the burden of production to offer some evidence on each of the elements but is not required to establish that it will ultimately prevail at trial on the merits. *T.L. v. Cook Children's Med. Ctr.*, 607 S.W.3d 9, 34 (Tex. App.—Fort Worth 2020, pet. denied). Therefore, we do not consider the ultimate merits of the underlying case and "will not assume that the evidence taken at a preliminary hearing will be the same as the evidence developed at a full trial on the merits." *Id.* In other words, the probability-of-success element requires only that "the applicant [ ] present enough evidence to raise a *bona fide* issue as to its right to ultimate relief." *Young G Kim*

7

*v. Ick Soo Oh*, No. 05-19-00947-CV, 2020 WL 2315854, at *2 (Tex. App.—Dallas May 11, 2020, no pet.) (mem. op.).

We review a trial court's decision to grant a temporary injunction for an abuse of discretion. *Id.* In doing so, we "view the evidence in the light most favorable to the trial court's order[ and] indulg[e] every reasonable inference in its favor." *IAC, Ltd. v. Bell Helicopter Textron, Inc.*, 160 S.W.3d 191, 196 (Tex. App.—Fort Worth 2005, no pet.). We must defer to the trial court's resolution of fact issues. *Wright v. Sport Supply Grp., Inc.*, 137 S.W.3d 289, 292 (Tex. App.—Beaumont 2004, no pet.); *see T.L.*, 607 S.W.3d at 34. But we review the trial court's application of the law to established facts and the resolution of pure legal questions de novo. *T.L.*, 607 S.W.3d at 34. "Findings of fact and conclusions of law embedded in a trial court's temporary injunction order may be helpful, but are not binding, in reviewing the court's exercise of its discretion." *Badger Tavern LP v. City of Dallas*, No. 05-23-00496-CV, 2024 WL 1340397, at *3 (Tex. App.—Dallas Mar. 29, 2024, no pet.) (mem. op.) (citing *Communicon, Ltd. v. Guy Brown Fire & Safety, Inc.*, No. 02-17-00330-CV, 2018 WL 1414837, at *6 (Tex. App.—Fort Worth Mar. 22, 2018, no pet.) (mem. op.)).

### III. Specificity of Order

In their first issue, the Individuals contend that the temporary-injunction order does not comply with the specificity requirements of Texas Rule of Civil Procedure 683.

8

**A. Applicable Law**

According to Rule 683, a temporary-injunction order must "set forth the reasons for its issuance" and "be specific in terms." Tex. R. Civ. P. 683. It must also "describe in reasonable detail and not by reference to the complaint or other document, the act or acts sought to be restrained" and state precisely why the applicant would suffer irreparable injury in the absence of an injunction preserving the status quo pending a trial on the merits. *Id.*; *Williams v. NE CS First Nat'l, LP*, No. 02-23-00086-CV, 2023 WL 4781174, at *2 (Tex. App.—Fort Worth July 27, 2023, no pet.) (mem. op.). An unsupported or conclusory statement that irreparable harm would occur without the injunction is insufficient to satisfy Rule 683. *Williams*, 2023 WL 4781174, at *2. Accordingly, "we cannot infer the reasons for an injunction from the pleadings, evidence presented at the hearing on the application, or the trial court's oral pronouncement." *Home Asset, Inc. v. MPT of Victory Lakes Fcer, LLC*, No. 01-22-00441-CV, 2023 WL 3183322, at *2 (Tex. App.—Houston [1st Dist.] May 2, 2023, no pet.) (mem. op.).

When determining if a temporary-injunction order is sufficiently specific to comply with Rule 683, we look no further than the order itself. *Powell v. Baker*, No. 04-22-00653-CV, 2023 WL 5418810, at *10 (Tex. App.—San Antonio Aug. 23, 2023, no pet.) (mem. op.); *Autonation, Inc. v. Hatfield*, 186 S.W.3d 576, 582 (Tex. App.—Houston [14th Dist.] 2005, no pet.). A temporary-injunction order that does not strictly satisfy Rule 683's requirements is void. *In re Luther*, 620 S.W.3d 715, 722 (Tex. 2021) (orig.

9

proceeding); *Bellefeuille v. Equine Sports Med. & Surgery, Weatherford Div., PLLC*, No. 02-15-00268-CV, 2016 WL 1163364, at \*3 (Tex. App.—Fort Worth Mar. 24, 2016, no pet.) (mem. op.).

**B. Analysis**

The Individuals give four reasons why they think the order is insufficiently specific: (1) it does not specify the basis for its conclusion that the Individuals are competing with New Western—based on their argument that the order does not specify the services the Individuals performed for New Western or that they are performing the same or similar services for a company that competes with New Western; (2) the order does not contain evidence that Baker, Ash, or Hayes entered into a covenant not to compete or nonsolicitation agreement with ManPow, nor does it contain evidence that Spain entered into any with UI 28; (3) the order does not contain facts to support its conclusion that Baker, Ash, or Hayes breached their agreements with UI 28 or that Spain breached his agreement with ManPow; and (4) the order's finding of irreparable injury is insufficient because it "contains no underlying facts to support the trial court's finding that there is a probable likelihood that [New Western] will lose investors, customers, and accounts to [the Individuals] or that [New Western's] business reputation and goodwill have been damaged as a result of any post-employment actions of [the Individuals]." They also argue that the order itself is "vague and overbroad" because it does not describe in sufficient detail the acts sought to be restrained.

10

## 1. Order Text

The order recites the facts supporting relief as follows:

(1) Plaintiff ManPow and Defendant Jacob Spain ("Spain") entered into a valid and enforceable Employment Agreement on or around February 1, 2022. The Employment Agreement reflects that Spain was the general manager of ManPow, and his duties included devoting his full time to the operations, business, and affairs of ManPow and its affiliated companies. The Employment Agreement also contains certain restrictive covenants including non-competition and non-solicitation provisions.

(2) As a general manager for ManPow, Spain principally performed services in Marion County, Indiana.

(3) Spain's employment relationship with Plaintiff ManPow ended on or around January 2, 2024.

(4) Plaintiff UI 28 and Defendants Stephen Baker ("Baker"), Conner Ash ("Ash"), and Cole Hayes ("Hayes") (collectively, the "Independent Contractor Defendants") entered into valid and enforceable independent contractor agreements (collectively, the "Independent Contractor Agreements") as follows:

i. UI 28 entered into an Independent Contractor Agreement with Hayes on or about May 10, 2022. Hayes voluntarily terminated his independent contractor relationship with UI 28 on January 3, 2024.

ii. UI 28 entered into an Independent Contractor Agreement with Baker on or about June 16, 2022. Baker voluntarily terminated his independent contractor relationship with UI 28 on January 4, 2024.

iii. UI 28 entered into an Independent Contractor Agreement with Ash on or about November 27, 2023. Ash voluntarily terminated his independent contractor relationship with UI 28 on January 3, 2024.

(5) Defendants are now all working with one another at a new company known as Aurumys, of which Spain is the Manager.

(6) The Employment Agreement and Independent Contractor Agreements (collectively, the "Agreements") prohibit Defendants from competing against their respective employers by performing the same or similar services Defendants performed as general manager and/or independent contractors for Plaintiffs (as applicable), within Marion County, Indiana and any counties contiguous thereto, for twenty-four (24) months following the termination of Defendants' employment and/or independent contractor relationships with Plaintiffs, for themselves, or any person, entity, or venture that competes with Plaintiffs' business.

(7) The Agreements prohibit Defendants from soliciting, enticing, persuading, inducing, calling upon, or providing services to any of Plaintiffs' investors, customers, or accounts that Defendants serviced, called upon, or learned information about through Defendants' interactions with Plaintiffs as an employee and/or independent contractors.

(8) The Agreements prohibit Defendants from interfering in any manner with any of Plaintiffs' customer or prospective customer relationships, which includes Plaintiffs' investors and prospective investor relationships.

(9) Spain's Employment Agreement defines Confidential Information as:

> **(h)** <u>Definitions</u>. For purposes of this Agreement and Employee's employment, these terms shall mean the following:
>
>> **(i)** "Confidential Information" is defined as, but is not limited to, all information considered by the Company or its customers and investors to be a trade secret, or otherwise proprietary and/or confidential. Confidential Information necessarily includes, but is not limited to, financial information and results; forecasts, business and strategic plans, surveys and analyses; marketing and sales plans; management systems; information relating to customers and investors (including customer and investor lists, and prospective customer and investor lists), customer account analysis; information relating to properties owned or targeted for
>>
>> acquisition by the Company (including all information regarding properties on Company systems); information relating to administrative and operational matters; lease, license and contract information; trademarks, trade dress, copyrights, patents, trade secrets and other intellectual property; training manual(s) and methods; computer programs, software system documentation, and hardware; specialized training provided by the Company or its affiliates, and other related information.

(10) Baker's and Hayes's Independent Contractor Agreements defines Confidential Information as:

> **(f)** <u>Definitions</u>. For purposes of this Agreement and Agent's services for the Company, these terms shall mean the following:
>
>> **(i)** "Confidential Information" is defined as, but is not limited to, all information considered by the Company or its customers to be proprietary and/or confidential. Confidential Information necessarily includes, but is not limited to, financial information and results; forecasts, business and strategic plans, surveys and analyses; marketing and sales plans; management systems; information relating to customers and investors (including customer, prospective customer, investor, and prospective investor lists), customer and investor account analysis; information relating to administrative and operational matters; lease, license and contract information; trademarks, trade dress, copyrights, patents, trade secrets and other intellectual property; training manual(s) and methods; computer programs, software system documentation, and hardware; specialized training, and other related information.

(11) Ash's Independent Contractor Agreement defines Confidential Information[1] as:

Footnote 1 reads: "For purposes of this Order, the Court uses the term "Confidential Information" to refer to the same term defined in each Agreement, which the Court finds are substantially similar."

13

(f)    Definitions. For purposes of this Agreement, these terms shall mean the following:

(i)    "Confidential Information" is defined as, but is not limited to, all information considered by the Company or its customers to be proprietary and/or confidential. Confidential Information necessarily includes, but is not limited to, financial information and results; forecasts, internal analytic dashboards, business and strategic plans, surveys and analyses; marketing and sales plans; management systems; information relating to customers and investors (including customer, prospective customer, investor, and prospective investor lists), customer and investor account analysis; information relating to administrative and operational matters; lease, license and contract information; trademarks, trade dress, copyrights, patents, trade secrets and other intellectual property; training manual(s) and methods; computer programs, software system documentation, and hardware; specialized training, and other related information, but does not include information that arises from Agent's general training, knowledge, skill, or expertise, whether gained on the job or otherwise, information that is readily ascertainable to the public, or information that Agent otherwise has a right to disclose as legally protected conduct.

(12) With respect to the restrictive covenants in the Agreements, including the non-competition and non-solicitation provisions, without reaching a final finding of enforceability at this injunction stage, it is probable that the non-competition and non-solicitation provisions are adequately supported by consideration, are reasonable and enforceable under Texas law, and are not greater than necessary to protect the goodwill and other business interests of Plaintiffs.

(13) Plaintiffs performed their obligations under the Employment Agreement and Independent Contractor Agreements by, among other things, compensating Defendants for services performed as an employee and independent contractors of Plaintiffs (as applicable) and providing Defendants access to proprietary and Confidential Information and information entitled to trade secret protection until the trial on the merits, including customer and investor lists, playbooks, market strategies, training materials, property analyses, and reports, collectively referred to as "Protectable Information."

(14) Based on the evidence presented, it is probable that the Employment Agreement confers third-party beneficiary status to UI 28, the nonsignatory Plaintiff, as it is an affiliate of Manpow. Specifically, paragraph 7 of the Employment Agreement states, in relevant part:

Employee agrees that the Restrictive Covenants protect the business of the Company and its Affiliates and that the Company's Affiliates are deemed to be a third-party beneficiary hereto, to the extent necessary.

The above section indicates an intent to create third-party beneficiary status.

(15) Based on the evidence presented, Manpow does not provide direct real estate services to clients or investors.

14

(16) Based on the evidence presented, it is probable that the Independent Contractor Agreements do not provide third-party beneficiary status as they lack any language conferring such a right. *S. Texas Water Auth. v. Lomas,* 223 S.W.3d 304, 306 (Tex. 2007) ("First, there is a presumption against conferring third-party-beneficiary status on noncontracting parties. . . . The intent to confer a direct benefit upon a third party "must be clearly and fully spelled out or enforcement by the third party must be denied.").

(17) Based on the evidence presented, it is probable at this injunction stage that Spain breached the Employment Agreement by, among other things, competing against Plaintiffs by engaging in buying and selling residential real estate, including the contracts of residential real estate by assignment, after the termination of their employee and independent contractor relationships with Plaintiffs, in Marion County, Indiana, or the contiguous counties.

(18) Based on the evidence presented, it is probable at this injunction stage that the Independent Contractor Defendants breached the Independent Contractor Agreements by, among other things, competing against UI 28 by engaging in buying and selling residential real estate, including the contracts of residential real estate by assignment, after the termination of their employee and independent contractor relationships with Plaintiffs, in Marion County, Indiana, or the contiguous counties.

(19) Based on the evidence presented, it is probable at this injunction stage that Spain breached the Employment Agreement by, among other things, soliciting Plaintiffs' investors, customers, and accounts Defendants serviced, called upon, or learned information about through Defendants' interactions with Plaintiffs as an employee and independent contractors. Specifically, and without limitation, Defendant Spain engaged in wholesaling and/or assigning a residential property located at 5230 Oak Ridge Dr., Mooresville, Morgan County, Indiana ("Oak Ridge Property"), a county contiguous to Marion County, Indiana, on or about February 13, 2024.

(20) Based on the evidence presented, it is probable at this injunction stage that the Independent Contractor Defendants breached the Independent Contractor Agreements by, among other things, soliciting UI 28's investors, customers, and accounts Defendants

15

serviced, called upon, or learned information about through Defendants' interactions with Plaintiffs as an employee and independent contractors. Specifically, and without limitation, Defendants Ash and Baker sent emails to Plaintiffs' investor contacts [listed by name] on January 10, 2024, marketing the wholesale/assignment of two properties located in Marion County, Indiana—15 N. Hawthorne Ln., Indianapolis, Indiana and 2623 E. Michigan St., Indianapolis, and New Western presented evidence these properties were in New Western's software systems, indicating they were the type of properties or transactions New Western pursued in its business. On January 12, 2024, Defendant Hayes emailed . . . a New Western employee, regarding the wholesale/assignment opportunity pertaining to the Hawthorne property. Accordingly, there is probable evidence Defendants interfered with Plaintiffs' customer and prospective customer relationships and competed with New Western in violation of the noncompetition provisions of their Agreements.

(21) The evidence further reflects Spain has improperly used or disclosed, or threatened to use or disclose, New Western's Protectable Information. The evidence also shows that the Independent Contractor Defendants have improperly used or disclosed, or threatened to use or disclose UI 28's Protectable Information.

**2. New Western**

Many of the Individuals' arguments are grounded on their assertion that the temporary-injunction order does not adequately distinguish between ManPow and UI 28 as individual entities. But the order describes Spain's duties as the manager of ManPow to "include[] devoting his full time to the operations, business, and affairs of ManPow *and its affiliated companies*." [Emphasis added.] It refers to ManPow and UI 28 collectively as New Western; it states that the Spain Agreement and Independent Contractor Agreements prohibit the Individuals "from competing against their respective employers by performing the same or similar services [the Individuals] performed as general manager and/or independent contractors for Plaintiffs [defined

16

collectively as ManPow and UI 28] (as applicable)"; and it concludes that it is probable the Spain Agreement "confers third-party beneficiary status to UI 28, the nonsignatory Plaintiff, *as it is an affiliate of Man*[*P*]*ow*." [Emphasis added.] Thus, the order itself sufficiently describes the relationship between ManPow and UI 28 such that the references to what it means by "New Western" are discernable without reference to outside sources. *See* Tex. R. Civ. P. 683; *Coney v. Prodigy Health, LLC*, No. 03-24-00130-CV, 2025 WL 698136, at *13 (Tex. App.—Austin Mar. 5, 2025, no pet. h.) (mem. op.) *cf. Est. of Shultz*, No. 11-21-00177-CV, 2022 WL 4099404, at *9 (Tex. App.—Eastland Sept. 8, 2022, no pet.) (mem. op.) (determining that order, "[r]ead as a whole," sufficiently identified "assets claimed by the Estate").

The Individuals also argue that there is no reason for the order to enjoin Baker, Ash, and Hayes from competing with ManPow or Spain from competing with UI 28. But this ignores the order's conclusion that the Spain Agreement specifically extended to ManPow's affiliates and its explanation that it is probable that UI 28 was a third-party beneficiary of the Spain Agreement. Additionally, although the order contains the conclusion that—unlike the Spain Agreement—the Independent Contractor Agreements likely do not confer third-party beneficiary status on ManPow, it also concludes that ManPow itself "does not provide direct real estate services to clients or investors." The order does not prohibit Baker, Ash, and Hayes from competing with ManPow; instead, it prohibits them from (1) "knowingly buying or selling single-family and 1-4 unit multi-family real estate investment properties by wholesale and/or

17

assignment" or (2) "knowingly assisting in the buying or selling of single-family and 1-4 unit multi-family real estate investment properties by wholesale and/or assignment"—activities that the order recited they had performed for UI 28. Accordingly, we hold that, in context, the order's references to New Western, and its conclusions based on its specific references to the terms of the Spain Agreement and the Independent Contractor Agreements, satisfy Rule 683. *See* Tex. R. Civ. P. 683; *Selva v. Pinnacle Partners Fin. Corp.*, No. 04-10-00521-CV, 2011 WL 915737, at *1 (Tex. App.—San Antonio Mar. 16, 2011, no pet.) (mem. op.); *Famous Dep't Store v. State*, 371 S.W.2d 76, 78–79 (Tex. App.—Amarillo 1963, no writ).

### 3. Services

The Individuals also complain that the temporary-injunction order does not adequately specify (1) what services the Individuals had performed for their respective companies, (2) that they were then performing and would continue to perform the same or similar services for a company in competition with ManPow or UI 28, and (3) what ManPow and UI 28 do.

The order describes the prohibited competitive actions in the Spain Agreement[4] and the Independent Contractor Agreements as "performing the same or

---

[4]Exhibit A to the Spain Agreement listed his responsibilities as "management of the Office [identified as Indianapolis, Indiana] to allow for the effective acquisition and/or disposition of real estate," and including "engag[ing] in recruiting and training services," "developing and cultivating relationships with qualified individuals . . . to . . . secure talent," "speak[ing] at career forums . . . for recruiting purposes," utilizing affiliated companies, "provid[ing] agents of the Company [defined as ManPow] with

similar services Defendants performed as general manager and/or independent contractors for Plaintiffs (as applicable), within Marion County, Indiana and any counties contiguous thereto"; it then further describes those competitive actions they were performing as "engaging in buying and selling residential real estate, including the contracts of residential real estate by assignment." It concludes that the Individuals "engaged in wholesaling and/or assigning a residential property located at 5230 Oak Ridge Dr., Mooresville, Morgan County, Indiana ('Oak Ridge Property'), a county contiguous to Marion County, Indiana, on or about February 13, 2024" and "market[ed] the wholesale/assignment of two properties located in Marion County, Indiana—15 N. Hawthorne Ln., Indianapolis, Indiana and 2623 E. Michigan St., Indianapolis." It further states that "New Western presented evidence these properties were in New Western's software systems, indicating they were the type of properties or transactions New Western pursued in its business."

Accordingly, reading together these provisions in the context of the order as a whole, we conclude that the temporary-injunction order adequately describes the types of services the Individuals had performed for New Western and were engaging in competitively, contrary to their respective agreements, after terminating their relationships with New Western. *See, e.g.*, *Hipps v. CBRE, Inc.*, No. 05-24-00056-CV, 2024 WL 3823233, at *9–10 (Tex. App.—Dallas Aug. 15, 2024, no pet.) (mem. op.);

affiliate's sales and product training," and "remain[ing] apprised of changes in the policies of these affiliates as they apply to the Company."

*cf. Layton v. Ball*, 396 S.W.3d 747, 751–53 (Tex. App.—Tyler 2013, no pet.) (reading order as a whole to determine that internal references adequately described prohibited activities in reasonable detail so as to be sufficiently specific under Rule 683).

### 4. Specific Instances of Breach

Baker, Ash, and Hayes contend that the order is insufficiently specific to show that they solicited New Western's contacts or provided services in violation of the Independent Contractor Agreements. Paragraph 20, set forth above, explains who was contacted—"investor contacts" and a current New Western employee—what they were contacted for, the location of the properties at issue, and how the contacts related specifically to New Western's business; in other words, it delineates specific acts of engaging in the business of buying and selling real estate by marketing properties for sale and soliciting clients for that purpose. We conclude that this paragraph sufficiently identifies specific prohibited acts committed by Baker, Ash, and Hayes. *See* Tex. R. Civ. P. 683.

The Individuals also argue that (1) the order is insufficiently specific because it does not specify an instance when Spain himself solicited or provided services after his employment with ManPow ended and (2) no facts support that Oak Ridge is one of New Western's customers. Paragraph 19 states that Spain "engaged in wholesaling and/or assigning a residential property located at 5230 Oak Ridge Dr., Mooresville, Morgan County, Indiana ('Oak Ridge Property'), a county contiguous to Marion County, Indiana, on or about February 13, 2024." Although Paragraph 19 does not

specifically state that the Oak Ridge property was listed in New Western's software systems—as does Paragraph 20 with the Hawthorne and Michigan properties—it nevertheless sufficiently identifies the evidence the trial court relied on to conclude that Spain had engaged in conduct prohibited by the Spain Agreement. *See Hipps*, 2024 WL 3823233, at *12; *Est. of Shultz*, 2022 WL 4099404, at *9.

**5. Lack of definitions**

The Individuals further contend that the order is impermissibly vague and "does not sufficiently detail the acts from which [they] are enjoined" in that it does not define the terms "wholesale," "assignment," "investors," "customers," and "accounts" because these terms have technical, industry-specific meanings. But nothing in the trial court's order indicates that these terms should be given technical, industry-specific meanings. *See* Tex. R. Civ. P. 683.

We construe court orders "according to the plain meaning[s] of their terms." *Green v. Villas on Town Lake Owners Ass'n*, No. 03-20-00375-CV, 2021 WL 4927414, at *9 (Tex. App.—Austin Oct. 22, 2021, pet. denied) (mem. op.). Merriam-Webster defines the verb "wholesale" as "to sell (something) in quantity usually for resale." *Wholesale*, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/wholesale (last visited Apr. 24, 2025). It defines "assignment" primarily as "the act of assigning something," and it defines "assign" primarily as "to transfer (property) to another especially in trust or for the benefit of creditors." *Assignment, Assign*, Merriam-Webster.com, https://www.merriam-

21

webster.com/dictionary/assignment, assign (last visited Apr. 24, 2025). It defines the verb "invest" (in a non-emotional sense) as "to commit (money) in order to earn a financial return" and "to make use of for future benefits or advantages," and it lists "investor" as a related noun. *Invest*, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/invest (last visited Apr. 24, 2025). Finally, Merriam-Webster defines "customer" as "one that purchases a commodity or service" and "account"—among the several financial-specific definitions—as "a formal business arrangement providing for regular dealings or services (such as banking, advertising, or store credit) and involving the establishment and maintenance of an account." *Customer*, *Account*, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/customer, account (last visited Apr. 24, 2025).

From the context of the entire order and the plain, ordinary meanings of these words, we conclude that the order sufficiently describes the prohibited activities. *See* Tex. R. Civ. P. 683; *Jowell v. BioTE Med., LLC*, No. 05-21-00166-CV, 2021 WL 4810361, at *13 (Tex. App.—Dallas Oct. 15, 2021, no pet.) (mem. op.); *cf. Morris v. City of Midland*, No. 11-22-00209-CV, 2023 WL 8262750, at *8 (Tex. App.—Eastland Nov. 30, 2023, pet. denied) (mem. op.) (holding that permanent-injunction order was sufficiently specific as to what activity was enjoined); *Clark v. Hastings Equity Partners, LLC*, 651 S.W.3d 359, 371–72 (Tex. App.—Houston [1st Dist.] 2022, no pet.) ("Restrained parties should be able to pick up a temporary injunction order, read it,

22

understand it, and not have to guess about what they are prohibited from doing upon threat of contempt.").

The Individuals also contend that the order fails to sufficiently "identify the investors, customers, and accounts that are off-limits." But Paragraphs 19 and 20 identify them specifically as New Western's "investors, customers, and accounts Defendants serviced, called upon, or learned information about through Defendants' interactions with Plaintiffs as an employee and independent contractors." The order also references that particular contacts and properties were included in New Western's "software systems." Thus, the order itself contained sufficient information from which it can be concluded that the customers referenced are those whom the Individuals directly interacted with or learned about from their work with New Western, particularly via its software system. *See* Tex. R. Civ. P. 683; *see also HMS Holdings Corp. v. Pub. Consulting Grp., Inc.*, No. 05-15-00925-CV, 2016 WL 1179436, at *4 (Tex. App.—Dallas Mar. 28, 2016, no pet.) (mem. op.); *Lockhart v. McCurley,* No. 10-09-00240-CV, 2010 WL 966029, at *4 (Tex. App.—Waco Mar. 10, 2010, no pet.) (mem. op.) ("The order need not identify the clients by name; it is reasonable to presume that Lockhart [the enjoined party] is 'sufficiently familiar with the employer's business and its customers to avoid violating the injunction.'" (quoting *Safeguard Bus. Sys., Inc. v. Schaffer*, 822 S.W.2d 640, 644 (Tex. App.—Dallas 1991, no writ))).

The order is distinguishable in this respect from those in *Coney*, 2025 WL 698136, at *14, *Contract Datascan Holdings, Inc. v. Retail Services WIS Corp.*, No. 02-23-

00153-CV, 2023 WL 7851509, at *28–31 (Tex. App.—Fort Worth Nov. 16, 2023, no pet.) (mem. op.), and *McCaskill v. National Circuit Assembly*, No. 05-17-01289-CV, 2018 WL 3154616, at *4 (Tex. App.—Dallas June 28, 2018, no pet.) (mem. op.). *See also Hernandez v. Combined Ins. Co. of Am.*, No. 02-20-00225-CV, 2021 WL 520456, at *23 (Tex. App.—Fort Worth Feb. 11, 2021, pet. denied) (mem. op.) (explaining why some orders that do not list specific customer names are sufficient under Rule 683 and others are not and collecting cases). In those cases, the referred-to customers could not be discerned from the order language itself. For instance, in *Coney*, the order simply attached "a list of 1,643 zip codes in which [the applicant's] customers [were] located." 2025 WL 698136, at *14. And in *Contract Datascan* and *McCaskill*, the injunction orders swept in not only the customer or customers the enjoined parties had directly dealt with or learned about as a result of their employment with the applicant but also—in the case of *Contract Datascan*—unidentified third parties who might not even have been clients and about whom the restrained party had no personal knowledge and—in the case of *McCaskill*—a corporate entity that had no personal knowledge of any client. *See Contract Datascan*, 2023 WL 7851509, at *28–30; *McCaskill*, 2018 WL 3154616, at *4.

### 6. Protected Information

The Individuals next contend that the order is conclusory and overbroad because it does not sufficiently describe what information of New Western's the Individuals are prohibited from using or accessing. The order quotes verbatim the

24

specific definitions of Confidential Information in the Spain Agreement and the Independent Contractor Agreements and adds the following to come up with the collective term "Protectable Information": "customer and investor lists, playbooks, market strategies, training materials, property analyses, and reports." This definition of Protectable Information is referable directly to the specific types of items protected and is apparent from the text. *See, e.g.*, *Hipps*, 2024 WL 3823233, at *10; *Super Starr Int'l, LLC v. Fresh Tex. Produce, LLC*, No. 13-18-00233-CV, 2019 WL 2385564, at *7 (Tex. App.—Corpus Christi–Edinburg June 6, 2019, no pet.) (mem. op. on reh'g), *pet. granted, case dism'd as moot*, No. 19-0629 (Mar. 13, 2020); *Lasser v. Amistco Separation Prods., Inc.*, No. 01-14-00432-CV, 2014 WL 4952501, at *6 (Tex. App.—Houston [1st Dist.] Oct. 2, 2014, no pet.) (mem. op.); *IAC, Ltd.*, 160 S.W.3d at 202. Thus, this aspect of the order is sufficiently specific under Rule 683.

### 7. Prohibited Recruitment

The Individuals further contend that the order does not have facts supporting an injunction against recruitment of New Western's employees; that a prohibition on recruitment is outside the scope of the Spain Agreement and the Independent Contractor Agreements; that it is overbroad because there is no nexus between this prohibition and the irreparable harm finding; and that it "does not specifically identify each of [New Western's] entities that are [the] subject of the recruitment injunction."

In the temporary-injunction order, the trial court found that the Individuals "are now all working together with one another at a new company known as

25

Aurumys, of which Spain [was] the Manager." In Paragraph 8, the trial court found that "[t]he Agreements prohibit [the Individuals] from interfering in any manner with any of [New Western's] customer or prospective customer relationships, which includes [New Western's] investors and prospective investor relationships." It also found that they had "improperly used or disclosed, or threatened to use or disclose UI 28's Protectable Information." Its definition of Protectable Information includes "customer and investor lists, playbooks, market strategies, training materials, property analyses, and reports." Finally, the trial court found that because of the Individuals' actions, there was a probable likelihood that New Western would lose investors, customers, and accounts to the Individuals and suffer "unquantifiable damage to [New Western's] business reputation and goodwill." Thus, the order sufficiently described what the Individuals had learned about and used during their former work with New Western; that Baker, Ash, and Hayes had moved from New Western to employment with Spain; that while employed with Spain, they had improperly used the information they had access to at New Western to compete with New Western; and that their doing so would likely cause New Western to lose business and suffer damage to its business reputation and goodwill. Read together in context, these provisions of the temporary-injunction order support the anti-recruitment injunction. *See* Tex. R. Civ. P. 683; *Miller v. Talley Dunn Gallery, LLC*, No. 05-15-00444-CV, 2016 WL 836775, at *6 (Tex. App.—Dallas Mar. 3, 2016, no pet.) (mem. op.).

26

**8. Irreparable Injury**

Finally, the Individuals claim that the order does not sufficiently "state precisely why the applicant would suffer irreparable injury in the absence of an injunction preserving the status quo pending a trial on the merits." The order concludes that there is "a probable likelihood of [New Western's] losing [its] investors, customers, and accounts to [the Individuals] and [suffering] unquantifiable damage to [its] business reputation and goodwill." This articulation of irreparable injury is sufficiently specific to satisfy Rule 683. *See Bellefeuille*, 2016 WL 1163364, at *4; *IAC, Ltd.*, 160 S.W.3d at 201; *see also Lynh Thy Pham v. M&M Orthodontics, PA*, No. 04-23-00780-CV, 2024 WL 3165999, at *5 (Tex. App.—San Antonio June 26, 2024, no pet.) (mem. op.); *Rodriguez v. Amit Thandi, MD PA*, No. 01-23-00482-CV, 2024 WL 2061605, at *10 (Tex. App.—Houston [1st Dist.] May 9, 2024, no pet.) (mem. op.); *Powell*, 2023 WL 5418810, at *11; *ABP Holdings, Inc. v. Rainbow Int'l LLC*, No. 10-21-00122-CV, 2021 WL 5920276, at *7 (Tex. App.—Waco Dec. 15, 2021, no pet.) (mem. op.); *Miller*, 2016 WL 836775, at *6; *Intercontinental Terminals Co. v. Vopak N. Am., Inc.*, 354 S.W.3d 887, 895 (Tex. App.—Houston [1st Dist.] 2011, no pet.); *Counsel Fin. Servs., L.L.C. v. Leibowitz*, No. 13-10-00200-CV, 2011 WL 2652158, at *10 (Tex. App.—Corpus Christi–Edinburg July 1, 2011, pet. denied) (mem. op.).

Having determined that the order is sufficiently specific as to each of the areas identified by the Individuals, we overrule the Individuals' first issue.

## IV. Merits of Probable Right to Recover

In their second issue, the Individuals argue that New Western did not produce sufficient evidence to support a probable right to recover because (1) "[t]here is no evidence that [the Individuals] are competing with [New Western]"; (2) "[the Individuals] never agreed they would not buy or sell residential real estate properties by wholesale and/or assignment"; (3) ManPow is not a party to the Independent Contractor Agreements; (4) "Spain does not have a non-competition agreement or non-solicitation agreement with Man[P]ow"; (5) "[t]he Injunction Order does not contain evidence that [the Individuals] solicited, called upon, or provided services to [New Western's] *actual* investors, customers, or accounts"; and (6) there is no evidence to support the order's "broad scope." We address the first four complaints together and the last two together.

### A. Evidence of Competition

The Individuals' first four subarguments are based again on the premise that the trial court should have considered ManPow and UI 28 as separate business entities performing separate functions. In support of their argument that no evidence shows that the Individuals are competing with New Western, they argue that the record does not show that "during [their] employment with Man[P]ow/UI 28 (as applicable), that Man[P]ow or UI 28 ever bought or sold residential real estate properties by wholesale or assignment," nor does it show that "since their termination, . . . any of the[m] have bought or sold any residential real estate by wholesale or assignment or 'knowingly

28

assisted' in the buying or selling of any residential real estate by wholesale or assignment." In their words, "there is no evidence that Man[P]ow is truly in that business," despite that the Spain Agreement states that ManPow's business is "buying and selling single-family and 1-4 unit multi-family real estate."

At the temporary-injunction hearing, Denyer and ManPow's President, Kurt Carlton, testified at length about the way New Western's business is structured. Powerhouse enters into the actual real-estate contract procurements and assignments, but UI 28's agents use New Western's database of property and investor leads to contact and manage those leads for Powerhouse. ManPow manages the database and assignment of leads to UI 28 agents. As general manager of ManPow, Spain procured UI 28's agents and trained them, and he assigned and supervised all their work. Of the Individuals, only he had access to all the customers and properties in New Western's software systems.

The Individuals note that Powerhouse is not identified specifically in the Spain Agreement as an affiliate of ManPow. But Denyer and Carlton both testified that Powerhouse is affiliated with ManPow and is ManPow and UI 28's arm for the larger real-estate business in which all three entities are engaged.

Carlton described New Western's business as building a "marketplace[]" and creating a specific industry niche. That niche involves using "the 2,000 leads in ManPow's database" to "provide [investors] with the opportunity to purchase properties." Carlton testified more specifically about what New Western does:

We [New Western] source the properties for the traditional flippers and landlords. So the way we structure our transaction works really well compared to a listing or something like that for these types of properties if you're sourcing for these investors. So we're holding on to this property for a very short period of time. We're not doing the work. We're not repairing it. We're passing it to an investor -- a local investor that specializes in that neighborhood. They understand the neighborhood. They do all the contracting work to return the house to market.

In other words, although ManPow and UI 28 themselves were not the entities actually entering into the buy-and-sell and assignment contracts, without the efforts of those employees and independent contractors, Powerhouse would have no contracts to enter into—these three entities worked together to engage in transactions.

Carlton described how ManPow and UI 28 had invested "a significant amount of money" to get the Indiana office up and running: "People, leads, support, infrastructure, brand marketing, paid search, training, outside support, and management and . . . [a] tremendous amount of money on recruiting." There was also a lot of compliance and regulatory work that had to occur, and ManPow took care of it. New Western had also developed a standardized playbook for showings on properties that told "how you do it." Its agents contact investors about potential properties via email and attach a "project analysis packet," which is property-specific but also includes a market analysis.

The foregoing evidence is sufficient to show how New Western's business model—with ManPow and UI 28 providing the leads and support that enabled Powerhouse to do the actual contracting—worked as a whole for the business of

"buying [and] selling single-family and 1-4 unit multi-family real estate investment properties by wholesale and/or assignment" and "assisting in the buying or selling of single-family and 1-4 unit multi-family real estate investment properties by wholesale and/or assignment."

## 1. Spain

As part of their argument, the Individuals claim that "[t]he [r]ecord contains no evidence that Spain is currently engaging in recruiting and training services for a company that is in competition with Man[P]ow." They also argue that Spain was not competing against ManPow because the order does not make any findings that he actually solicited or recruited ManPow employees.

We have already explained how the Spain Agreement extended to ManPow's affiliates and how New Western's business model worked. Additionally, Carlton testified about the work Spain did as a ManPow employee to open the Indiana office on New Western's behalf. According to Carlton, entering a new market means "start[ing] from scratch because real estate is local." On the property side, New Western had to identify sellers, "do a lot of direct-to-seller marketing," and send emails to investors.

Regarding this side of the business, Spain recruited and onboarded the UI 28 agents, trained them, decided what agents got what leads, helped make marketing decisions, and "work[ed] with [the] local centralized data team with the information they had to help him understand [which] neighborhoods were working and [which]

31

weren't, and where [New Western] could sell things and what the pricing should be [to] develop a buy box[5] for that marketing."

Specifically, ManPow helped develop the Indiana market's database of leads that UI 28's agents used. As Carlton explained, leads were developed

> either on the property side or the investor side. A lead would be identifying someone who's either interested and qualified to invest in real estate or somebody that does it regularly on the investor side. On the seller side it could be -- in the beginning generally a direct seller but as time goes on it could be real estate agents that have maybe the types of homes that they don't -- they don't think it's appropriate to list on MLS, they don't really know what to do with it, that is a good fit. There's these real estate wholesalers that find opportunities that could be leads that could bring us properties as well.

ManPow had to learn through trial and error which leads were good and which were bad:

> [I]t's just the research and development of just spending the money and going through it so many times. We've got a marketing team that's constantly analyzing everything and optimizing these marketing campaigns. There's playbooks on how to qualify, how to identify, solicit customers, bring them in, all these things that we just developed over time and redevelop every year.

According to Carlton, "Spain ha[d] access to everything" in Indiana because he managed the leads and distribution. Spain also

> managed the UI operation for Indiana. So that would involve coordinating closings, that would involve ensuring the transactions occurred, coordinating with the title company, communicating constantly with the title company on behalf of the agents to ensure that

---

[5]As Carlton explained, a buy box is basically a map of the city in which areas are targeted based on the particular properties the company is interested in and helps it to focus its marketing efforts based on its goals.

the transactions were closed, and any other kind of administrative or other services that were included in ensuring that we could buy and sell real estate for that office related to the closings and other aspects.

The Individuals also argue that Denyer and Carlton had no personal knowledge that Spain himself had recruited Baker, Ash, and Hayes. Carlton testified that Spain is the broker of record for Aurumys. And when asked, "What -- how do you have personal knowledge, other than what your attorneys told you, that Spain recruited and hired Baker, Ash and Hayes through his company Aurumys?" he answered, "The Real Estate Commission in Indianapolis reflects them -- reflects him as their supervising broker." Additionally, New Western produced evidence of email contacts that Baker, Ash, and Hayes had made while employed at Aurumys that specifically targeted New Western's email contacts in its database.

Accordingly, New Western produced sufficient evidence from which the trial court could have concluded that New Western had shown a probable right to recover on its claim that Spain had violated the Spain Agreement.

### 2. Baker, Ash, and Hayes

The Individuals also contend that "[t]he [r]ecord contains no evidence that Hayes, Baker, and/or Ash's current job function includes locating and acquiring suitable real estate properties for acquisition and/or assisting with selling or disposing of real estate properties for a company that is in competition with UI 28." They point out that the order does not contain findings that Baker, Ash, or Hayes had assisted UI 28 in purchasing or buying real estate and that the Independent Contractor

Agreements do not "prohibit any [of them] from engaging in buying and selling residential real estate, including the contracts of residential real estate by assignment."

Carlton testified at length about Baker, Ash, and Hayes's functions for UI 28.[6] He explained that UI 28 had two different types of agents: acquisition agents and disposition agents. Baker was primarily an acquisition agent, and Ash and Hayes were disposition agents.

An acquisition agent follows leads on a day-to-day basis, which involves keeping up with comparative market analysis, visiting the properties, and coming up with a marketing plan. When Spain was at ManPow, he worked directly with the acquisition agents in their performance of these activities. The agents are trained through a program called New Western University, which is a collection of approximately 300 training videos that is kept confidential.

Disposition agents "would work the leads. They would move them through the onboarding process to become disclosed investors . . . . And then . . . the properties would be sent out to the investors . . . ." The agents develop investors by contacts: "They come to us, we talk to them." They also qualify the investors financially. Once qualified, the investors "sign a series of disclosures . . . [and are then] allowed to see the properties." Hayes, for instance, received 1,400 investor contacts in the year

---

[6]Although the Individuals point out that Denyer said that he had no personal knowledge of what they did, Carlton testified at length about their roles as independent contractors with UI 28.

before the temporary-injunction hearing and had "about 300 investors . . . that he was sending properties to."

Denyer also testified about how UI 28 fit into New Western's business model even though it had existed only since 2021:

> The learning that has happened over that 15 years comes through the funnel and goes all the way into any new enterprise that is within New Western companies, and that aggregation of learning is then implanted into a localized, in this example, UI 28's market. The investment of the million[s] of dollars, the data stack, the data understanding, the learned behaviors, the predication of how to do the transaction, the legal workforce, the structuring, I mean, this goes on and on and on. You've spent millions of dollars to understand when is the best time to reach out to a person, when is the best time to make a property available, when is the best time to do those things. These are the things, the algorithm, the data stack, the formulation of understanding the market, otherwise you just do business day one, right, and they didn't. So that is the secret recipe. That is the source, and you cannot get that from day one, otherwise everybody would be doing it day one, and they don't unless they steal our data.[7]

We hold that the foregoing evidence is sufficient to support the trial court's order.[8]

---

[7]Exhibit 22 includes a cover email that Carlton testified is the same type of email that Ash would send to contacts as a UI 28 agent. He testified that New Western "designed this process."

[8]The Individuals also argue that there is no evidence that ManPow is a third-party beneficiary of the Independent Contractor Agreements and that the trial court abused its discretion by finding that UI 28 is an "affiliate" of ManPow as that term is used in the Spain Agreement. In light of the evidence presented about the structure of New Western's business model, these arguments are more pertinent to the ultimate merits, which we do not resolve at this stage. *See Matuszak v. Hous. Oilers, Inc.*, 515 S.W.2d 725, 728–29 (Tex. App.—Houston [14th Dist.] 1974, no writ).

**B. Database Complaints**

The Individuals raise two complaints related to the "leads" database about which Carlton testified at length. They first argue that the evidence did not show that they were actively competing with New Western because the evidence shows that they had not contacted any of New Western's actual customers. They also argue that the order is unreasonably broad in its scope because it requires them to recall any investor or property they worked with.

Denyer testified that by 2024, New Western "had built together an audience of over 2,000 within [their] database . . . to get the different flows of business in and out both sides of the marketplace." Only Spain had access to the entire customer list. In doing his job, Spain was provided with "lots of confidential information." In exchange, he was given "[v]ast amounts of training, material, vast amounts of information, data, lists, behaviors, . . . [a] treasure trove of information."

At some point, New Western found out through "a number of e-mails" that the Individuals "were doing [its] style of transactions[] and . . . had taken [its] data." Specifically, the emails showed that "properties that had been in [New Western's] database . . . were now appearing in Aurumys' emails." New Western was able to determine this because its database had quality-control measures: "[W]e will put e-mails that are captured e-mails, as in New Western e-mails, into the database to ensure that processes, work flows, and quality control of what's happening during the cycle of us distilling information is all executed properly." In other words, their database

36

contained made-up emails that did not belong to an actual lead.[9] According to Carlton, "They were marketing a property to an e-mail address that should not have received an external e-mail."[10]

The quality-control emails are not in any public database and could have been obtained only by accessing New Western's email system. When asked exactly what data the Individuals stole, Denyer answered, "[T]he customer list." He also said, "[T]hey appear to have migrated properties from our software platform into their pockets, yeah. So again, it goes back to the data." He did not know exactly how the Individuals got these email addresses, but he knew they could only have gotten them from New Western's nonpublic database.

The evidence showed that, after forming and operating Aurumys, Spain had sent an email about a property in New Western's database (the Oak Ridge property) to a former New Western employee working at Aurumys but had accidentally sent it

---

[9]Carlton explained, "[T]here's no reason for anyone to take this one e-mail. This is not a person. This e-mail doesn't exist anywhere but in this database. . . . It was created for one purpose." New Western itself would never send an email to any of the quality-control addresses.

[10]For example, Carlton testified that an email was sent to a Seth Henderson:

Well, this was highly unusual. This told us that our data had been compromised. . . . [W]e have some pretty strict restrictions on who can export this data, and because this is not -- Seth Henderson isn't a real person, it's not somebody -- somebody would have spoken to, it's not somebody . . . would have called, I think -- this tells me that this database was just exported in mass [sic] and then used in an e-mail campaign from a competitor.

to that person's New Western email address. According to Carlton, the Oak Ridge property was entered into New Western's database in September 2023. It was a typical "[d]ouble close and assignment" deal of the type that New Western "has made its business conducting." When asked, "And so from Exhibit 31 do we see Mr. Hayes after leaving New Western continue to market the same type of properties that he would've marketed while serving New Western?" he answered, "That's right." He knew from this contact that Spain was engaging in direct competition:

> Because the series of events that I can observe are similar to what they would be doing with us in our transaction and our business which is very different and nuanced to the rest of the industry, and because this property here is one they were working while they were with us and then they're closing on it in their organization.

Denyer's and Carlton's testimony that the quality-control contacts could have been obtained only from New Western's nonpublic database is sufficient evidence to support the trial court's conclusion that the Individuals were engaging in prohibited competition by using the database to obtain New Western's leads. Further, considering that the evidence supported this conclusion, the scope of the prohibited contacts in the temporary-injunction order is not overbroad. *See Thomas v. A\*Med Mgmt., Inc.*, No. 01-19-00564-CV, 2020 WL 5269412, at \*2–4, \*6–7 (Tex. App.—Houston [1st Dist.] Sept. 3, 2020, no pet.) (mem. op.).

We overrule the Individuals' second issue.

## V. Conclusion

Having overruled the Individuals' two issues, we affirm the trial court's temporary-injunction order.

/s/ Wade Birdwell

Wade Birdwell
Justice

Delivered: May 1, 2025